UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GAYLE EISENBERG,

    Plaintiff,                                    Hon. Ellen S. Carmody

v.                                            Case No. 1:04-CV-569

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## **OPINION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. On October 29, 2004, the parties consented to proceed before the undersigned for all further proceedings, including an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Richard Alan Enslen referred resolution of this matter to this Court. (Dkt. #9).

Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 45 years of age at the time of the ALJ's decision. (Tr. 16, 22). She successfully completed high school and worked previously as a cashier, assembler, machine operator, delivery driver, and sales attendant. (Tr. 16, 86-91, 294-98).

Plaintiff applied for benefits on November 1, 2001, alleging that she had been disabled since October 14, 2000, due to "stroke-related limitations." (Tr. 45-47, 64, 244-46). Her application was denied on February 28, 2002. (Tr. 247). Plaintiff did not pursue the matter any further.

Plaintiff next applied for benefits on June 19, 2002, alleging that she had been disabled since July 6, 2001. (Tr. 49-51, 252-54). Her application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 26-44, 248-65). On January 27, 2004, Plaintiff appeared before ALJ Earl Witten, with testimony being offered by Plaintiff and vocational expert, Heather Benton. (Tr. 272-306). In a written decision dated June 15, 2004, the ALJ determined that Plaintiff was not disabled as defined by the Act. (Tr. 15-22). The Appeals Council declined to review the ALJ's decision, rendering it the Commissioner's final decision in the matter. (Tr. 5-8). Plaintiff subsequently appealed the matter in this Court pursuant to 42 U.S.C. § 405(g).

## **MEDICAL HISTORY**

On or about October 17, 2000, Plaintiff reported to the emergency room after smoking marijuana which had been "tainted with embalming fluid." (Tr. 178, 192). Plaintiff reported that she was experiencing "acute onset of right-sided weakness and numbness." (Tr. 178). She did not, however, experience any vision change or language dysfunction. Plaintiff was not admitted to the hospital, but was instead discharged home. *Id.* When examined on October 24, 2000, Plaintiff reported that she was able to "walk and talk o.k. now." (Tr. 192). On November 29, 2000, Plaintiff reported that she "feels good now." (Tr. 161).

On November 13, 2001, Plaintiff participated in an MRI examination of her brain, the results of which revealed "multiple foci of signal change in the periventricular white matter of both cerebral hemispheres. . .fairly advanced for a patient of this age." (Tr. 185-86). This was "suggestive but not diagnostic of demyelinating disease such as multiple sclerosis and correlation with constellation of clinical findings is recommended." (Tr. 186). The examination also revealed "moderately advanced changes of cerebral atrophy." *Id.* X-rays of Plaintiff's right knee performed the same day revealed "early changes of osteoarthritis" with "no evidence of acute fracture or dislocation." (Tr. 185).

On December 4, 2001, Plaintiff was examined by Dr. John Wald. (Tr. 178-79). Plaintiff reported that the right-sided weakness and numbness she experienced after smoking the tainted marijuana had "gradually improved," although she reported experiencing "intermittent unsteadiness." (Tr. 178). The results of a neurologic examination were normal and Plaintiff exhibited normal strength and sensation. (Tr. 179). The doctor reported the following:

4

> I am uncertain of the exact explanation of her symptoms. While the acute onset could be stroke, I am unaware of formaldehyde or other embalming fluid producing stroke when inhaled. This could certainly produce a transient vasculitis, something such as acute disseminated encephalomyelitis (ADEM). This may explain what is seen on the [MRI] scan as well as the acute onset of her symptoms.
>
> To look for potential markers for vasculitaties I want to check ANA, ENA, Vitamin B12, rheumatoid factor. I also want to check carotid ultrasound to be certain that there is no focal stenosis that could produce any of these changes.

*Id.*

The doctor concluded that Plaintiff either (a) suffered a stroke, (b) experienced the first event of demyelinating disease, or (c) suffered a transient vasculitis related to the toxin in the marijuana. (Tr. 146). Plaintiff was instructed to take one aspirin daily, stop smoking cigarettes, and stop smoking marijuana. (Tr. 179).

On December 18, 2001, Plaintiff participated in a carotid artery doppler examination, the results of which revealed "no findings indicative of a hemodynamic significant stenosis within either internal carotid arteries." (Tr. 153). The results of Vitamin B12 testing was within normal limits and the results of ANA, ENA, and rheumatoid factor testing were all negative. (Tr. 181-84).

On January 5, 2002, Plaintiff completed a questionnaire regarding her activities. (Tr. 110-16). Plaintiff reported that she can walk 1-2 miles "on a level surface without stopping" and can climb 14 stairs "at a normal pace without resting." (Tr. 110). Plaintiff reported that she spends six hours daily performing various chores around the house, such as washing laundry, washing dishes, vacuuming, dusting, mopping, shoveling snow, and performing household repairs. (Tr. 111, 114). She also reported that she reads, watches television, shops, drives, cooks, and cares for her child.

(Tr. 111, 113-15). Plaintiff further reported that she bowls, goes fishing, sews, swims, attends movies, plays cards, and plays volleyball. (Tr. 115-16).

On January 11, 2002, Dr. Kevin Walton, one of Plaintiff's treating physicians, reported that Plaintiff suffered "no condition serious enough for disability." (Tr. 187).

On January 11, 2002, Mimi Sies, R.N., completed a report regarding Plaintiff's impairments. (Tr. 173-77). Sies reported that Plaintiff experienced "intermittent unsteadiness" and walked with a "slight" limp. (Tr. 174). She reported that Plaintiff experiences back pain which intermittently radiates into her right leg. (Tr. 175). The nurse also reported that Plaintiff "drops items" with her right hand and gets "confused." (Tr. 174). Sies concluded that these impairments imposed "no limitation" on Plaintiff's ability to lift/carry or stand/walk. (Tr. 176). In fact, the only limitation identified by the nurse was that Plaintiff was "not able to play ball." (Tr. 175).

On February 4, 2002, Plaintiff was examined by Dr. Wald. (Tr. 146-47). Plaintiff reported that she was experiencing "continued gradual improvement in right side sensory and motor function." (Tr. 146). The results of motor and neurological testing were "normal." Dr. Wald concluded that Plaintiff

> had a single event of right-sided motor and sensory abnormality. This would be most consistent with stroke, though the MRI scan shows more diffuse abnormality. I have explained to her that while this could be stroke, it could have been a transient vasculitis, where this could evolve over time into a more progressive disease such as vasculitis or multiple sclerosis.

*Id.*

On May 30, 2002, Plaintiff was examined by Dr. Wald. (Tr. 144-45). Plaintiff reported that she had experienced "recurrent symptoms over the last month." (Tr. 144). Specifically,

6

she reported experiencing "a sense of numbness and weakness in the right leg with stiffness and spasticity." Plaintiff also reported that "she thinks there is right vision change, and she has a sense of dizziness and drunkenness." Dr. Wald described Plaintiff's gait as "quite abnormal with a spastic appearance, some eversion of the right leg." Plaintiff also exhibited "decreased [sensory] perception throughout the right leg, with a level to the low thoracic region on the right." *Id.* Dr. Wald concluded that "the fact that [Plaintiff] has now had a second event without toxin exposure, and the abnormal MRI suggesting diffuse demyelination, would now suggest strongly a diagnosis of Multiple Sclerosis." (Tr. 145).

On June 10, 2002, Plaintiff reported to nurse Sies that she continued to smoke marijuana because it helped her "sleep" and "relax." (Tr. 169).

On August 12, 2002, nurse Sies reported that Plaintiff "has a diagnosis of multiple sclerosis with myelopathy affecting the right leg. She, also, experiences visual changes, a sense of dizziness and drunkenness." (Tr. 150). The nurse concluded that Plaintiff "is, presently, in no condition to work." *Id.*

On August 22, 2002, Plaintiff was examined by Dr. Wald. (Tr. 241). Plaintiff reported that she "has been improving" and is "now able to walk up and down stairs and the numbness of the right leg has resolved." She further reported that she has not experienced any "new problems." An examination of Plaintiff's cranial nerves revealed "minimal nystagmus, no diplopia on lateral gaze." A motor examination revealed "some form of circumduction of the right leg, [but] no weakness." Plaintiff exhibited "normal" sensation. The doctor diagnosed Plaintiff with "probable" Multiple Sclerosis for which a medication regimen was prescribed. *Id.*

7

On October 26, 2002, Plaintiff participated in a consultive examination performed by Dr. Phillip Pullen. (Tr. 199-201). Plaintiff reported experiencing numbness and tingling in her right lower extremity which causes her "great difficulty" walking. (Tr. 199). She also reported experiencing dizziness, but denied experiencing any vision problems. Plaintiff reported that she can perform activities of daily living. *Id.* She walked with a "moderate right limp and a wide based gait." (Tr. 200). Plaintiff also exhibited "difficulty" performing orthopedic maneuvers and also exhibited "mild motor weakness of the right lower extremity along with atrophy and diminished sensation." (Tr. 201).

On February 20, 2003, Plaintiff was examined by Dr. Wald. (Tr. 242). Plaintiff reported that she "had no problems with the medication" and has "improved considerably." She reported that she "is able to ambulate with a cane. . .[but] does have some fatigue and unsteadiness as well as incoordination as well." An examination of Plaintiff's cranial nerves revealed "full normal eye movement, no diplopia or malalignment, symmetric facial sensation and movement, no dysarthria." Plaintiff ambulated with a "somewhat wide based" gait and exhibited "mild" ataxia in her upper extremities. Plaintiff exhibited normal sensation. Dr. Wald diagnosed Plaintiff with "probable multiple sclerosis, improved." *Id.*

On August 5, 2003, Plaintiff was examined by Dr. Wald. (Tr. 243). Plaintiff reported that she has not experienced any further attacks since beginning her medication and was experiencing "no real problems with the multiple sclerosis." Plaintiff reported that she was "able to ambulate with a cane with no falls" and has experienced "no vision, speech or swallowing problems." Plaintiff also reported that while she was experiencing "some fatigue" that "has improved" as well. Plaintiff walked with a "mildly wide based gait" and exhibited "normal power"

8

with only "minimal" ataxia. The results of an examination were otherwise unremarkable. Dr. Wald diagnosed Plaintiff with "probable multiple sclerosis, stable." *Id.*

At the January 27, 2004 administrative hearing, Plaintiff testified that her right leg "tingles all the time." (Tr. 277). She also reported that she experiences difficulty walking because her "balance is really bad, because I get the dizziness." *Id.* Plaintiff testified that she experiences "real bad" dizziness "most of the time, most always." (Tr. 279). Plaintiff reported that her right leg was so weak that she "just can't lift it, hardly." (Tr. 278). Plaintiff testified that she gets "the shakes" in her right arm "every couple of days." *Id.* She reported that these episodes last "about three hours" and prevent her from moving her arm or grasping objects. (Tr. 278-79). Plaintiff reported that if she walks only 20 feet she will "get dizzy" and "fall over." (Tr. 280-81). However, Plaintiff later testified that she does the grocery shopping for her family. (Tr. 286). She also reported that she washes dishes and washes laundry. (Tr. 285).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1]  If the Commissioner can make a

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffers from the following severe impairments: multiple sclerosis and early osteoarthritis of the right knee. (Tr. 18). The ALJ further determined that these impairments, whether considered alone or in combination, fail to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ determined that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 20-21). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience,

---

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

10

perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she can lift 10 pounds occasionally and 5 pounds frequently, (2) she cannot stand or walk more than 2 hours during an 8-hour workday, (3) no repetitive bending, twisting, or turning, (4) no climbing, crawling, squatting, or kneeling, (5) no work requiring the performance of overhead tasks or the use of air/vibrating tools, (6) no repetitive pushing or pulling, (7) no working around unprotected heights or dangerous moving machinery, (8) no work involving complex or detailed instructions, and (9) she can perform only unskilled, repetitive 1-2 step work. (Tr. 19-20). After reviewing the relevant medical evidence, the Court finds that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff can perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Heather Benton.

The vocational expert testified that there existed approximately 15,800 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 301-02). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold). The vocational expert also testified that if Plaintiff were further limited in that she required a sit-stand option, there still existed approximately 15,800 jobs which she could perform. (Tr. 302).

a. The ALJ properly evaluated Plaintiff's subjective complaints

The ALJ concluded that Plaintiff's subjective allegations of pain and limitation were "somewhat overstated and inconsistent with the available evidence." (Tr. 19). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at \*6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

13

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony") (citations omitted). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

It is not disputed that Plaintiff suffers from severe impairments. However, as the ALJ correctly observed, none of Plaintiff's treating physicians have imposed limitations inconsistent with her RFC. (Tr. 19). As the ALJ further observed, "[t]he data in the record suggests that [Plaintiff's] multiple sclerosis is fairly stable." *Id.* While Plaintiff testified at the administrative hearing that she is impaired to a significant degree, her testimony is not supported by any objective medical evidence and, furthermore, lacks internal consistency. For example, Plaintiff testified that she is unable to walk 20 feet without getting dizzy and falling over. (Tr. 280-81). She later testified, however, that performs the grocery shopping for her family and performs certain household chores. (Tr. 285-86). In sum, there exists substantial evidence to support the ALJ's credibility determination.

  b. Plaintiff does not meet the requirements of section 11.09 of the Listing of Impairments

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled. Plaintiff asserts that she satisfies the requirements of section 11.09 (Multiple Sclerosis) of the Listing. This particular section of the Listing provides as follows:

  11.09 Multiple sclerosis. With:

  A. Disorganization of motor function as described in 11.04B[2]; or

  B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or

  C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.09.

As discussed above, the objective medical evidence as reported by Plaintiff's treating physicians fails to support the conclusion that Plaintiff satisfies any portion of this particular Listing. To the extent that Plaintiff relies on the opinions expressed by Nurse Sies, her reliance is misplaced. First, Nurse Sies is not considered an acceptable source of "medical" evidence. 20 C.F.R. §§ 404.1513, 416.913. More significantly, as the ALJ correctly concluded, the opinions expressed by Nurse Sies "are internally inconsistent, not well-supported objectively, and inconsistent with other

---

[2] Section 11.04B of the Listing is satisfied by "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.04.

15

substantial evidence in the record." (Tr. 20). In sum, there exists substantial evidence that Plaintiff does not satisfy this (or any) section of the Listing of Impairments.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.

Date:  August 29, 2005                                        /s/ Ellen S. Carmody
                                                                          ELLEN S. CARMODY
                                                                          United States Magistrate Judge